The STATE of Texas, Appellant,

v.

Darrell Warren WALKER, Appellee.

No. 14–03–01176–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

June 22, 2004.

762

Joel H. Bennett, Galveston, for State.

Miles M. Whittington, Galveston, and Richard H. Branson, League City, for Appellee.

Panel consists of Justices YATES, ANDERSON, and HUDSON.

## OPINION

JOHN S. ANDERSON, Justice.

The issue in this case is whether an affidavit in support of a request for a search warrant contains facts establishing probable cause. After being indicted for possession of a controlled substance, cocaine, in an amount of 400 grams or more, with intent to deliver, appellee Darrell Warren Walker filed a motion to suppress evidence, including cocaine, found in his residence during a search pursuant to a warrant. The trial court granted the motion to suppress, and the State appeals. Concluding the search warrant affidavit was sufficient to establish probable cause the evidence would be in Walker's residence, we reverse and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 12, 2001, Officer Mark Miller, who was then employed as a narcotics investigator with the Galveston Police Department, applied for a search warrant. In his affidavit, he alleged the following could be found at Walker's residence at 1102 Natchez Drive in Texas City: cocaine, ledgers and financial information, and narcotic paraphernalia used in the manufacture, delivery or sale of cocaine. After setting forth his background in narcotics investigations, Miller described the investigation leading to his belief the preceding items could be found at Walker's residence:

In December of 2001, Your Affiant obtained information from a cooperating individual, who will Hereinafter be referred to as CI, this CI will remain nameless for the security and safety of the CI. The CI stated that Ricky Edward Baker is a multi ounce cocaine trafficker that obtains his, Baker's, cocaine from Darrell Wand Walker AKA "Moonie", who resides at [1102 Natchez Drive, Texas City], and is a cocaine dealer and routinely maintains a quantity of cocaine for sale at his, Walker's, residence. The CI further stated that the CI has purchased cocaine from Baker on numerous occasions during the last several weeks and knows that Baker obtains Baker's cocaine from Walker.

Inv. Miller conducted a NCIC/TCIC check on Walker and the criminal history shows that [W]alker has one conviction for dangerous drugs.

On 1211–2001, CI contacted Baker who stated that Baker was going to Texas City between the hours of 7:00 PM and 8:00 PM to obtain a quantity of cocaine from Walker.

On 12–11–2001, your Affiant with assistance from other Law enforcement agencies sat surveillance on Baker's residence located at 610 Ferry Road # 15, in Galveston, Galveston County, Texas. The surveillance group observed Baker drive to 1102 Natchez, in Texas City, Galveston County, Texas, where Officer Robles observed Baker enter said residence. Officer Robles later observed Baker exit the residence at 1102 Natchez and walk to Baker's vehicle a 1996 Ford Taurus bearing Texas license plate XZC–27Z. Officer Robles observed Baker walk to Baker's vehicle and open the trunk lid on Baker's vehicle. Officer Robles then observed Baker place a package on the passenger side area of the trunk and then attempted to cover the package with some type of cloth. Officer Robles then observed Baker en-

ter listed vehicle and depart listed residence.

Miller stated the surveillance team then followed Baker south on Interstate 45, where DPS Trooper Reyer stopped Baker for traffic violations. After Reyer initially obtained Baker's consent to search Baker's vehicle, Officer Valdez arrived with "Qui," a certified narcotic detection canine. Baker then withdrew his consent to search and Valdez commanded Qui to perform a perimeter check on Baker's vehicle. Qui alerted to the rear passenger side trunk of Baker's vehicle. Valdez opened the trunk and discovered a quart-size zip-lock bag under a blue rag. The bag contained a large quantity of a substance that gave a positive reaction for cocaine when Reyer tested it. Reyer discovered the cocaine in the same area of the trunk where Robles observed Baker place the package.

Miller also set forth the basis for his belief the CI was credible and the information reliable:

> Your Affiant believes this CI to be credible and the information reliable. This CI has provided intelligence information regarding persons actively engaged in violations of the Health and Safety Code Chapter 481, specifically Delivery of Cocaine on many occasions over the past three months. On each and every occasion this information provided by the CI has proved true and correct. Your Affiant has been able to verify this intelligence information through your Affiant's own independent knowledge of Controlled Substance violations in the GALVESTON County area and through conversations with other officers in the GALVESTON County Area who are assigned to the Narcotics Enforcement. In addition; this CI has provided information and assistance which lead [sic] to the developing of several felony deliveries of Con-

trolled Substance violations, to wit: Cocaine on 2 separate persons.

Finally, Miller observed, given their respective experiences, he and the CI could recognize cocaine in its various forms and packaging for sale and distribution. Miller also explained the basis for his belief that items in addition to cocaine could be found at Walker's residence. In Miller's experience, persons involved in the sale and distribution of cocaine maintain documents, lists of suppliers and customers, financial records, and narcotic paraphernalia.

A magistrate issued the search warrant on December 12, 2001. The officers executing the search found approximately a kilogram and a half of cocaine at Walker's residence. A grand jury indicted Walker for possession of a controlled substance, cocaine, in an amount of 400 grams or more, with intent to deliver.[1]

Setting forth multiple grounds, Walker filed a motion to suppress the evidence seized in the search. He subsequently narrowed his argument to a challenge to the sufficiency of the affidavit to support the issuing judge's determination of probable cause. Following a hearing, the trial court granted the motion. The State filed this interlocutory appeal.

## DISCUSSION

### Issue Presented

In a single issue, the State argues the trial court erred in granting Walker's motion to suppress. The State contends the search warrant and supporting affidavit sufficiently established probable cause for the issuing judge to conclude drugs were present at Walker's residence. Walker points to the double hearsay (Baker's statements to the CI, level one, which were related to Miller, level 2) in the affi-

---

1. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon 2003).

davit and argues the information contained in the affidavit did not provide a substantial basis for crediting the hearsay at each level.

### Legal Standards and Standard of Review

■ The constitutions of the United States and the State of Texas guarantee individuals the right to be free from unreasonable searches and seizures. U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. In Texas, the affidavit supporting a search warrant must state probable cause. *Zarychta v. State,* 44 S.W.3d 155, 165 (Tex. App.-Houston [14th Dist.] 2001, pet. ref'd).

■ To determine whether the facts alleged in an affidavit sufficiently support a search warrant, a magistrate or a court examines the totality of the circumstances *See Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *Ramos v. State,* 934 S.W.2d 358, 362–63 (Tex.Crim.App.1996). The allegations in an affidavit are sufficient if they would "justify a conclusion that the object of the search is probably on the premises." *Ramos,* 934 S.W.2d at 363. In determining the sufficiency of a search warrant affidavit, a reviewing court may consider only the facts found within the four corners of the affidavit. *Jones v. State,* 833 S.W.2d 118, 123 (Tex.Crim.App.1992). Nevertheless, the reviewing magistrate is permitted to draw reasonable inferences from the facts and circumstances alleged, and must interpret the affidavit in a common sense and realistic manner. *See Lagrone v. State,* 742 S.W.2d 659, 661 (Tex.Crim.App. 1987).

■ In reviewing the trial court's ruling on the motion to suppress, we apply a bifurcated standard of review. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex. Crim.App.2000). We give almost total deference to the trial court's determination of historical facts that depend on credibility and demeanor, but conduct a *de novo* review of the trial court's application of the law to facts if resolution of those ultimate questions does not turn on evaluation of credibility and demeanor. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997); *see Carmouche,* 10 S.W.3d at 327.

■ Because probable cause to support the issuance of the warrant is determined from the "four corners" of the affidavit alone, the trial court does not make credibility choices in determining the sufficiency of an affidavit to establish probable cause. *Burke v. State,* 27 S.W.3d 651, 654 (Tex.App.-Waco 2000, pet. ref'd) (citing *Wynn v. State,* 996 S.W.2d 324, 326–27 (Tex.App.-Fort Worth 1999, no pet.)). Thus, we review *de novo* the trial court's ruling on the sufficiency of the affidavit. *See Johnson v. State,* 68 S.W.3d 644, 652–53 (Tex.Crim.App.2002); *Guzman,* 955 S.W.2d at 89.

■ Nevertheless, our scrutiny of the sufficiency of an affidavit, like the trial court's scrutiny, does not take the form of a *de novo* review; instead, we determine whether the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing. *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331; *Daniels v. State,* 999 S.W.2d 52, 54 (Tex.App.-Houston [14th Dist.] 1999, no pet.). In conducting this review, we give great deference to the magistrate's determination of probable cause. *Ramos,* 934 S.W.2d at 363; *Daniels,* 999 S.W.2d at 54. If in a particular case it may not be easy to determine whether an affidavit demonstrates the existence of probable cause, the resolution of such doubtful or marginal cases should be largely determined by the preference to be accorded warrants. *Lopez v. State,* 535 S.W.2d 643, 647 (Tex.Crim.App. 1976).

*Analysis*

 Officer Miller, the affiant in the present case, relied in part on information he received from a confidential informant, who, in turn received information from Ricky Baker, Walker's purported customer. Double hearsay may be used to show probable cause if the underlying circumstances indicate a substantial basis for crediting each level of hearsay. *Allen v. State,* 899 S.W.2d 296, 299 (Tex.App.-Houston [14th Dist.] 1995), *pet. dism'd, improvidently granted,* 945 S.W.2d 829 (Tex.Crim.App.1997). Moreover, although an informant's veracity, reliability, and basis of knowledge are highly relevant in determining the value of an informant's report, these elements are not independent requirements but are closely intertwined issues that illuminate the overall question of whether there is probable cause. *Gates,* 462 U.S. at 230, 103 S.Ct. at 2328.

 According to the affidavit, the confidential informant said he had purchased cocaine from Baker several times during the previous several weeks. Miller stated the confidential informant had provided intelligence information regarding controlled substances violations on many occasions over the previous three months and, on each occasion, the information proved true and correct. An affidavit in support of a warrant to search for narcotics need not provide more specific details about the informant's reliability than to state the informant provided information in the past regarding narcotics trafficking, which information had proved correct. *Blake v. State,* 125 S.W.3d 717, 726 (Tex.

App.-Houston [1st Dist.] 2003, no pet.) (citing *Torres v. State,* 552 S.W.2d 821, 824 (Tex.Crim.App.1977)). Furthermore, because such a statement, when interpreted in a realistic and common-sense manner, indicates the informant's familiarity with controlled substances, the affiant need provide no additional details to describe the informant's qualifications in recognizing drugs. *Id.* (citing *Torres,* 552 S.W.2d at 824).

According to the affidavit, on December 11, 2001, the confidential informant contacted Baker, who stated he would be going to Texas City between 7:00 p.m. and 8:00 p.m. to obtain cocaine from Walker. From the affidavit, it appears the confidential informant provided this information to Miller.[2]

The confidential informant also stated Baker obtains his cocaine from Walker, who routinely keeps a quantity of cocaine for sale at his (Walker's) residence.[3] From the affidavit, this latter information appears to be based on observations by Baker, not by the confidential informant. In the early stages of the investigation, Baker was the only apparent source of information that placed cocaine in Walker's residence.[4]

In the affidavit, however, Miller does not rely solely on the confidential informant's information to show there was cocaine in Walker's residence. Instead, Miller relies on his own and other officers' observations during their surveillance of Baker while he was at Walker's residence and during the subsequent traffic stop. Those observa-

---

2. At the suppression hearing, Miller testified he listened to a conversation between Baker and the confidential informant, but Miller did not include this information in the search warrant affidavit.

3. From the affidavit, it appears Baker was the source of the confidential informant's information that Walker was a cocaine dealer.

4. Miller's representation that documents and drug paraphernalia also were in Walker's residence were based on Walker's being a cocaine dealer and Miller's experience and training regarding persons involved in the sale and distribution of cocaine.

tions included seeing Baker enter Walker's residence, later leave the residence, place a package on the passenger side of the trunk, and attempt to cover it with some type of cloth. Officers then followed Baker from Walker's residence until Baker was stopped for a traffic violation. During the stop, officers found crack cocaine in a quart-size zip lock bag under a blue rag in the same area of the trunk where Baker was observed placing the package when he left Walker's residence.

■ The affidavit here compares more than favorably to those held sufficient in *Carrillo v. State,* 98 S.W.3d 789 (Tex.App.-Amarillo 2003, pet. ref'd); and *Ramos v. State,* 31 S.W.3d 762 (Tex.App.-Houston [1st Dist] 2000, no pet.). In *Carrillo,* the affidavit provided in part:

> (B) Within the last 24 hours Affiant was able to make an undercover purchase of a substance believed to be Cocaine from a subject. Affiant met with this subject and paid in advance for a quantity of Cocaine. The subject advised Affiant he/she had to travel to another location to receive the cocaine. This subject left Affiant and drove directly to this residence. Upon arriving, this subject went inside the residence, and exited a short time later. The amount of time the subject spent inside the residence was consistent with a narcotics transaction. The subject then left and drove a short distance to a pay phone, where a call was placed. After the call, this subject drove directly back to this residence and went inside again. When he/she arrived the second time, a 1991 Plymouth Van had arrived bearing Texas Registration DB28CX. After a short time, this subject left this residence and drove directly back to Affiant, where a quantity of cocaine was delivered to Affiant. This subject was kept under surveillance during this entire time and met with no other subjects. The substance pur-

chased tested positive for cocaine using a Scott Reagent Field Test kit. Affiant is able to recognize Cocaine and other controlled substances.

> (C) Lubbock Power and Light records indicate a Virginia Carrillo as the resident of this address. Lubbock Police Department records indicate an Angelo Rufus Carrillo and Mary Ann Carrillo as the residents of this address. The listed vehicle returns to Angel Rufus Carrillo at this resident [sic].

*Carrillo,* 98 S.W.3d at 792.

The *Carrillo* court of appeals rejected the defendant's argument that the case involved a confidential informant performing a "controlled buy" with a possible motive to mislead the police regarding the source of the cocaine. *Id.* at 792–93. The court also rejected the defendant's argument that the absence of a showing an occupant of the residence gave the subject the cocaine weighed against a finding of probable cause. *Id.* at 793. The court observed, "The question for the magistrate's decision was if there was a fair probability that cocaine could be found in the house rather than whether someone in the house gave it to the subject." *Id.* Finally, the court distinguished the case before it from *Hass v. State,* which Walker cites in the present appeal:

> In *Hass,* the court held a showing that police found contraband on passengers of a car departing a storage facility did not justify a search of the facility. However, in this case, the subject went to the house after offering to sell cocaine and delivered the substance after returning from the house. Thus, the facts before us are distinguishable from those before the *Hass* court.

*Id.* (citing *Hass v. State,* 790 S.W.2d 609, 612 (Tex.Crim.App.1990)) (citation omitted).

Similar to the situation in *Carrillo,* and unlike that in *Hass,* the police in the pres-

ent case had information, set forth in the affidavit, that Baker was going to Walker's residence to obtain cocaine. After Baker left the residence, he was in possession of the same substance the police believed he went to obtain. Nothing in the record before us suggests the police found anything other than cocaine in Baker's trunk when he was stopped.

In *Ramos,* the affiant stated he received information that the residence to be searched was being used by a Hispanic male to store numerous pounds of marijuana and possibly cocaine with the intent to distribute that marijuana and cocaine to other individuals throughout the area. *Ramos,* 31 S.W.3d at 763. The affiant then described police surveillance on the residence, terminating in discovery of twenty pounds of marijuana in a pick-up truck being driven by a man who had spent the night at the residence. *Id.* at 763–64. The court of appeals summarized the affiant's description of the surveillance as follows:

> During the surveillance the police observed appellant, whose description was consistent with the information received from the informant. In the morning, a man who had spent the night in the house exited the house and got into a white pick-up truck that appeared to have been in the driveway all night. Although there was a gap in surveillance during the early morning hours, the affidavit states the truck was in the same place, indicating it had not been moved during the time the surveillance team was gone. Once the truck left the house, the affidavit shows that it made no stops such as to permit it to pick up a 20–pound bag. The presence of the large, dark bag in the white bed of the truck and the "heat runs" [a driver's efforts to determine whether or not he is under surveillance] through the neighborhood indicate that the driver knew that there was a bag in the truck that

contained contraband. Because 20 pounds of marihuana has substantial value, it is reasonable to infer that it was not left overnight in the truck, but rather was placed in the bed of the truck when the driver exited the house and entered the truck. The informant had said there were numerous pounds of marihuana at the house.

*Id.* at 765 (footnote omitted).

Unlike the present case, the officers in *Ramos* were unsure whether the driver had placed anything in the truck when he got into the truck and left the residence. *Id.* at 764. Also, unlike the present case, there was a gap in the surveillance. *Id.* at 763–65. Thus, the surveillance described in the affidavit in the present case produced more facts connecting the contraband in the stopped vehicle with the residence that was the subject of the search warrant than did the surveillance described in the *Ramos* affidavit.

Walker, however, argues his case is analogous to *Lowery v. State,* 98 S.W.3d 398 (Tex.App.-Amarillo 2003, no pet.); *State v. Ozuna,* 88 S.W.3d 307 (Tex.App.-San Antonio 2002, pet. ref'd); *Barraza v. State,* 900 S.W.2d 840 (Tex.App.-Corpus Christi 1995, no pet.); and *Lowery v. State,* 843 S.W.2d 136 (Tex.App.-Dallas 1992, pet. ref'd). We disagree.

In the 2003 *Lowery* case, the confidential informant reported he had been in the residence to be searched and had spoken with a person named Golden who appeared under the influence of methamphetamine. *Lowery,* 98 S.W.3d at 400–01. The appellate court summarized the insufficiency of the affidavit as follows:

> [T]he pertinent and substantive allegations purportedly justifying the search of the residence consisted of nothing more than the statement that methamphetamine was cooked within the previous 24 hours at some unmentioned place by Golden and someone else, Golden was

later found intoxicated, Golden was previously at some unmentioned location where drug paraphernalia was seized at some time or another, and appellant was previously arrested for possessing a controlled substance.

*Id.* at 401. The appellate court also observed, "Notably absent from the affidavit ... is any mention of ... the presence of chemicals or equipment in the residence that could be used to 'cook' methamphetamine, [or] the presence of methamphetamine or matter that looked like it in the residence (aside from that allegedly coursing through Golden's body)." *Id.*

In *Ozuna,* the police sought to search Ozuna's residence for heroin and stolen property. *Ozuna,* 88 S.W.3d at 309. The affiant stated that a named informant said Ozuna was a heroin supplier and younger men stole items for Ozuna in exchange for drugs. *Id.* The informant also stated Ozuna was in possession of stolen bicycles and computers. *Id.* A second named informant confirmed the first's statement. *Id.* Other information in the affidavit included a report of recovery of a stolen bicycle from Ozuna's brother's truck, information about an arrest warrant for Ozuna on multiple charges, and a two-year-old search of Ozuna's father's residence, immediately above Ozuna's, which yielded a usable amount of heroin. *Id.* There is nothing in the appellate opinion to suggest either informant said stolen items or heroin were at Ozuna's residence. There is also nothing to suggest the affidavit contained any information about surveillance on Ozuna's residence.

In *Barraza,* the affiant stated a reliable and credible confidential informant advised another officer that a person by the name of Gann was enroute to Barraza's residence to purchase a quantity of marijuana. *Barraza,* 900 S.W.2d at 841. The informant described Gann's car and provided the licence plate number. *Id.* Officers then conducted surveillance at the intersection of a highway and a farm to market road, which "at some point" intersected the road where Barraza's residence was located. *Id.* at 841, 842. The officers observed Gann's car, stopped it, and discovered five pounds of suspected marijuana. *Id.* at 841. As the court of appeals observed, "There is nothing ... in the affidavit to show when, where, or from whom [Gann] acquired the marihuana. The affidavit also fails to show whether or not Mr. Gann's vehicle was seen at the suspected place or even on the street of the suspected location." *Id.* at 842. In contrast to the affidavit in *Barraza,* Miller's affidavit sets out facts supporting a reasonable inference Walker's residence was the source of the cocaine in Baker's trunk.

The 1992 *Lowery* case centered on an untested informant, a relative of a person who purchased amphetamines at the residence that was the subject of the search warrant: 911 Camellia Drive. *See Lowery,* 843 S.W.2d at 139–40. The parties agreed that this untested informant was the "critical tipster" because he actually reported the presence of amphetamines at the address. *Id.* at 140. Although the tipster stated he had been in the residence within the previous forty-eight hours, he apparently had no personal knowledge amphetamines were located in the house, but only had been told they were there. *See id.* at 139, 140.[5] The State, however, con-

---

5. The affidavit paragraph reporting the tipster's information read in part: "This untested informant also stated to Ofc. White that there was a large quantity of amphetamines inside the residence of 911 Camellia Drive, Duncanville, Dallas County, Texas. This un-

tested informant was inside the residence within the past 48 hours and was told that the amphetamines were there." *Lowery v. State,* 843 S.W.2d 136, 139 (Tex.App.-Dallas 1992, pet. ref'd).

tended the following information in the affidavit established probable cause to search the residence: (1) several informants told an Officer Crawford there was a drug lab located in an underground house where David Lowery and Steve Patton lived; (2) subsequent investigation showed Lowery's address was 911 Camellia Drive and corroborated that the house had underground rooms; (3) Officer Crawford said Patton drove a black Mercedes, and the affiant regularly observed a black Mercedes parked at the house over a two-month period; (4) a reliable informant reported hearing about an amphetamine lab on Camellia Drive; and (5) the critical tipster, a relative of a drug purchaser, heard about the presence of amphetamines inside the house at 911 Camellia Drive. *Id.* at 140.

The court of appeals disagreed. *Id.* at 141. The court acknowledged an informant's tip combined with independent police investigation may provide a substantial basis for the probable-cause finding. *Id.* (citing *Janecka v. State,* 739 S.W.2d 813, 825 (Tex.Crim.App.1987)). The court, however, observed:

> The affidavit reflects that police surveillance and investigation corroborated the following facts: (1) Lowery and Patton lived at 911 Camellia Drive; (2) the house located at that address had underground rooms; and (3) during a two-month period, Officer Reynolds saw a black Mercedes at 911 Camellia Drive

on several occasions. However, this corroborates only innocent facts, not suspicious or criminal activity related to the possession of amphetamine at 911 Camellia Drive. The corroborated facts do not provide any indicia of reliability regarding the statements of the "critical tipster" or of any of the other informants that amphetamines were located in the house.

*Id.* at 141–42.[6]

None of the cases on which Walker relies involved police surveillance matching the level of surveillance in the present case, surveillance which included (1) observing Baker, who had stated he was going to obtain cocaine, enter and leave the subject residence, (2) observing Baker place an object in the trunk of his car, (3) following the car, and, (4) after stopping the car, retrieving cocaine from the same part of the trunk where the object had been placed. Unlike the affidavits in the two *Lowery* cases, *Ozuna,* and *Barraza,* the search warrant affidavit in the present case contains facts supporting a reasonable inference cocaine would be found in the residence to be searched.

Probable cause sufficient to support a search warrant exists if the facts contained within the four corners of the search warrant affidavit and the reasonable inferences drawn therefrom justify the magistrate's conclusion that the object of the search is probably on the premises at the time of the warrant's issuance. *Cassias v.*

---

**6.** To the extent the 1992 *Lowery* court focused on the fact the surveillance corroborated "only innocent facts," its analysis is inconsistent with *Illinois v. Gates* in which the Supreme Court stated:

> [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastical-

ly more rigorous definition of probable cause than the security of our citizens' demands.... In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.

*Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983).

*State,* 719 S.W.2d 585, 587–88 (Tex.Crim. App.1986). Because the search warrant affidavit established probable cause to believe cocaine was present at Walker's residence, the trial court erred in suppressing the evidence found there.

We therefore sustain the State's sole issue. We reverse the cause for further proceeding consistent with this opinion.